Let's just wait for the audience to leave. Okay. Mr. Gilbert. Thank you very much, Your Honor. Good afternoon. May it please the Court, Michael Gilbert for Appellant Howard Rubin. I respectfully request two minutes for rebuttal. Your Honors, the District Court ordered Mr. Rubin detained based on an incorrect application of the standards set forth in the Bail Reform Act, which is manifest in the transcript of the Court's brief ruling. The District Court's ruling was clear error inconsistent with the plain language of the statute. Mr. Rubin is a 71-year-old man with health problems. He's a United States citizen who has spent his entire life in the United States. His family is in the United States. He's never lived in any other country. I'm sorry. In terms of what is the clear error that's reflected in the transcript, what is that? Is that the no guaranteed security measures that would prevent flights? That is one of several clear errors. But, yes, Your Honor, the — If you look at the transcript, it says there's no guaranteed security measures that would prevent flight. And then the immediately next sentence is, as defense counsel points out, you don't need guarantee. You just need reasonably likely. And then he goes on to consider whether it's reasonably likely that he — that it would — whether it would prevent flights. So, you know, isn't the District Court just walking through the steps by saying, well, this doesn't make it impossible if he could flee, so there's no guarantee. Now I'm going to apply the statutory standard and decide whether it's reasonably likely. I mean, I don't read that as applying a different standard than the statutory one. Well, respectfully, Your Honor, I read it as requiring a guarantee. But — In fact, the sentence after that is if all we had was unsupported speculation, then maybe he's sitting under another $70 million somewhere that he hasn't disclosed. And yada, yada. If that was it alone, that speculation wouldn't be enough for me to find the government has met its burden. Right? So it goes on to look to see whether there is evidence of that reasonable likelihood. Right. But I think that's the fundamental problem with the Court's ruling, is that with regard to each of the factors, while the Court stated the standard correctly, the Court didn't apply it. You have an interesting argument as to whether danger in the community can be separate from the crime with which he is charged. That's a very interesting argument. But the Court didn't go just on that. It went on likelihood of flight. And the various behaviors of your client certainly suggest likelihood of flight. If we look at that and take the whole of the district court's opinion, how can we say that it went on the wrong standard when what it was doing was a standard thing of seeing whether, yeah, this is a likelihood of flight? Because the standard, Your Honor, is that the Court is to make a determination as to whether, with the conditions proposed, that there's a likelihood of flight. And the judge specifically found that the standard — that with the conditions that were being proposed, number one, repeat criminal offense was physically impossible, and number two, with respect to any risk of flight — It stated that in one — in a few words, and then went on and said something else. I'm sorry, Your Honor. It said — The district judge says that, says obviously he can't commit this crime again if he's on lockdown, but then goes on to talk about other problems that he still could present, right? Well, the district court said it would be physically impossible for him to commit the sex crimes with which he was charged. And then the district court did go on to reference an assertion by the government that there had been a request by one of the proposed shorters to make a Zell payment that said — that in some way referred to changing his floor at the MDC, and that that type of behavior was somehow criminal activity that could be looked at independently. And respectfully, that is just not the type of danger to the community that the Bail Reform Act is aimed at, number one. But number two, with the conditions that we have proposed, it would be not only physically impossible for him to commit any sex crimes, but we propose that he'd be subject to electronic monitoring of his communications. And so even any possibility that there could be some request by a third party on his behalf to change the floor in the MDC is something that couldn't possibly occur with these conditions.  Let me ask you — this is, I will admit, a Bail Reform Act nerd question. But — I should. We're under the rebuttable presumption, right, because of the nature of the charge defense. Okay. And so we are at this high standard because of the nature of the offense. But I was thinking through the fact that if it were not that kind of offense, we would have this provision that says that he could be detained if there was, what is it, a substantial risk, a serious risk that he'll obstruct or attempt to obstruct justice or threaten, injure, or intimidate a witness or juror. That's — that's a standard we use to allow detention in cases charging less serious crimes, or at least things that are perceived as less dangerous to the public. But this record, it seems to me, would clearly support detention under the risk of sort of the ideas of tampering and intimidating and obstruction, given the history of your client's representations to the court and the court's firm findings about various problems with that. So what I'm sort of struggling with is the idea that if this were a bank fraud case and we were under that standard, that would be a pretty easy way to affirm a district court's finding. But here, because we're focused more strictly on it's just danger to the community or risk of non-appearance — remember, we're not talking about flight necessarily — it's reasonably assured the appearance of the defendant as directed, that almost seems in this case that you're arguing that's harder, that — that if we just show that there's some risk of intimidation or obstruction, which the record is replete with the risk of obstruction, I think, that that's not enough here because of the conditions. Is that your argument, that even if the government were able to establish a risk of — a serious risk of obstruction, that that would be insufficient to warrant detention in this case? Well, in this case, the government has not come forward with evidence that even remotely suggests that there's a serious risk of obstruction. The factors that the government has pointed to in that respect include things like the government has asserted that it was obstructive conduct that a private investigator was hired. Or failure to disclose assets? Well, failure to disclose assets, we have a vigorous dispute about whether that is a fair characterization at all of what happened, because when he was arrested and interviewed by pretrial services, he was asked what his net worth was, and he gave an estimate that was within a few percentage points of what it turns out after a full report. The number was about right. So I don't think that there's any basis. Unless there was an allegation of an undisclosed account. Well, that's exactly the concern that we have with the district court's ruling, Your Honor, is that what the district court said is we don't know what we don't know. Okay. There might be undisclosed accounts. What we do know — I could be misremembering this. That there is no specific allegation of a specific account? Correct. Okay. And I would say that is after the government, having conducted a 10-year, we think, investigation, but certainly a multiyear investigation, subpoenaing — subpoenas to all of his financial institutions, careful review of all that material. After Mr. Rubin on — submitted to the court detailed financial affidavits that list out each asset that he owns, and after they've had years to review his electronic communications, they have not come forward with anything to suggest that there are any undisclosed assets. Other than that, we don't know what we don't know, as the district court put it, and that is not a correct application of the Bail Reform Act. And that is the same exact problem that we see with the court's findings about risk of flight and — It's the insurance policy I'm thinking about, an insurance policy that he allegedly borrowed against that was undisclosed, I thought. Well, so there are multiple insurance policies. Mr. Rubin and his wife had insurance policies that were purchased 20 years ago, obviously nothing to do with any potential risk of flight or any reason to secrete assets. He was asked for a disclosure of assets, of his assets. He had a policy in his own name, and he disclosed it. The government takes issue with the fact that in that context, he didn't say, oh, And by the way, in addition to that, there's also a trust, which he did not own. He was one of three trustees. And so I don't think that it can fairly be characterized that there was any effort to hide anything. And at the end of the day, he submitted full statements of that trust policy. He submitted full statements of the shortener's trust policy, his wife, Ms. Rubin, who was proposed to sign the bond and also had her own policy. It's all there, and it's all been disclosed. But to address any concerns, we've also proposed, which I think, frankly, is an extraordinary proposal, given that this is not a financial fraud case, that he's going to relinquish any of his rights to control any of his assets as part of this bail package. We're going to have an independent trustee appointed. We've proposed to do that. We're open to having it be a trustee that is appointed under the auspices of the  We'll hear from you again on rebuttal, but let's hear first from the government. Thank you. Ms. Benson. May it please the Court, Assistant United States Attorney Kayla Benson for the government. The district court and the magistrate judges before it did not clearly air in detaining Rubin as both a danger and a risk of flight, given the strength of the evidence that the facing life guidelines and sex trafficking charges that carry significant mandatory minimums, the brutal nature of the alleged conduct, which includes deception and horrific violence against women for a decade, the use of legal and financial coercion and other obstructive tactics to intimidate and dissuade witnesses from reporting him and his actions upon his arrest and the misrepresentations that he made throughout the course of five detention hearings in the district court. And so I want to start with Your Honor's question about the missing life insurance policy. And so at the first detention hearing, there was a representation to the magistrate judge at that time that Rubin had one Crown Global life insurance policy that was housed in the Cayman Islands, and he reported to pretrial services the amount that he estimated that policy was worth. There was no mention of this trust policy that he had access to. His lawyer stood up at that argument and argued before the magistrate judge one single foreign account. Between the first and the second hearings, defense counsel called one of the AUSAs and told the government that the Rubin policy, which I'll call his own policy, was the only foreign policy he had. He didn't say anything about the trust policy. But we could see that the defendant was getting disbursements from three separate Crown Global accounts. And so only when we confronted defense counsel about this did they disclose, yes, he is a trustee to the trust policy. But it's an egregious omission because he had actually been taking millions and millions of dollars from the trust policy even in the two years preceding his arrest. So 2024 and 2025, he received disbursements of $2.25 million and $5 million as loans against the trust policy. And so I think the idea that there was not some kind of a lie or a misrepresentation about the access to wealth that the defendant had, which was what the magistrate judge was clearly interested in, was determining what he had access to in order to determine whether or not the proposed bond amount would actually have significance to this defendant. But I also want to just briefly touch on a number of other misrepresentations that were made during the course of the bail proceedings. So first, there was just reference to this dispute at the NDC. And the government submits that there is really no doubt that he and his wife attempted to make a payment to get him moved to a different floor, and that can only be characterized as an attempted bribe. In a call on September 30th, he tells Mary, there's a guy here that can get me on the quiet floor, but it's going to cost like $800. A few days later, she submits a Zelle payment asking whether Howard got the floor that he wanted. And the point of that, obviously, is that she thought that she was paying somebody who had the ability and authority to get him moved within the jail. There was also, I think, misrepresentations made about his passport, misrepresentations made about the number, about the, about why he had so many cell phones, which, again, I think, as the magistrate judge found, it's not the fact of his possession of all of those cell phones that was necessarily so problematic, but it was the misrepresentations and the changing stories that were made throughout the course of the detention proceedings. And then I think... Why are the misrepresentations as opposed to the cell phones themselves a dispositive thing? Because that's evidence that there must be something else of which the district court is unaware? Well, I think both support the government's argument about risk of flight, and certainly we argue that having seven cell phones in your house at the time that you were arrested is itself evidence of risk of flight. But then certainly lying about, you know, at the first bail hearing or perhaps the second bail hearing, he represented that he just kept those because his counsel told him to, given the pending, or the pending appeal in the civil litigation, and that his kids were playing with them. But as it turns out, of course, two of the cell phones are brand new in boxes, and one of them was stored in a bag that also had a tent. There was also significant lies to pretrial services about his drug use, and so I think the court has that in the record, but he lied about his drug use. He also lied about his drug use in his deposition in the civil case, and so I think that goes to some of the obstructive conduct that your honors were referencing. So maybe I'll just turn to Judge Calabresi's question briefly about whether or not obstructive conduct can constitute dangerousness, and I think that this court has held that it can. In United States v. La Fontaine, which is a case that we cite in our brief, the court held that even one instance of witness tampering or attempted witness tampering could constitute dangerousness, and so I think it's clear under this court's precedent that that can be the case. Here, obviously, we have, as the government outlined in its brief and in the many hearings before the magistrate judges, numerous ways in which the defendant obstructed justice, including before the civil case was filed and including after the civil case was filed. And the risk of non-appearance is by preponderance, right? Because the dangerousness is clear convincing evidence? That's right. But the finding as to risk of non-appearance only needs to be made by preponderance? That's right, and of course we're on a clear error standard before this court. So unless the court has any further questions, the government will rest on its papers. Thank you. Thank you very much. And Ms. Benson, we'll turn it back to Mr. Gilbert on rebuttal. Thank you very much. I think the fundamental question under the Bail Reform Act, which gets lost, is that whether these conditions will reasonably assure, reasonably assure, not guarantee whether the judge concluded the guarantee was needed or not. And I think that there can be no doubt that under these conditions, it's impossible for him to commit any sex crimes. It's impossible for him to obstruct justice any further. We completely disagree with the government's characterizations about what they claim to be obstructive activity. But how's it going to happen? It's not going to happen when he's in 24-7 surveillance, on guards, in his house, all his communications are monitored. It's impossible that that activity will occur. And therefore, the standard is satisfied. Now, they talk about the passport. The reality is that when he was arrested, he was asked if he had the passport there, and he invoked his constitutional rights. And the government, despite that, has completely — has come back time and time again and said, well, he didn't disclose or he didn't — he had the right not to answer the question, and he didn't do it. But at the end of the day, that passport was not in his house in Connecticut where he was arrested. It was in Manhattan. And so that completely undermines any notion that he was poised to flee or that the cell phones that he had were somehow to help him get away. Because if he was planning to go somewhere, the first thing that he would have would be his passport. And that's something that we all agree was not there. So I think a fair reading of the standards of the Bail Reform Act, which asks the question, are — will these conditions reasonably assure? Undoubtedly, it's the case that these conditions will assure. He has no access to any funds. He has no access to a passport. He's under 24-7 surveillance. He's got a video feed that we've offered to have direct-to-pretrial services. He can't go anywhere. He's got a complex trial with terabytes of information to be reviewed. We don't even have a trial date yet. And so he's sitting at the MDC indefinitely when he has, in fact, satisfied the standards of the Bail Reform Act, and he should be released.